UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X
JOSE GUERRERO,

                            Plaintiff,           **MEMORANDUM AND ORDER**
                                                 19-CV-6239 (KAM)(SJB)

     -against-


CHARLES LOIACONO and COSTCO WHOLESALE
CORPORATION,

                            Defendants.
---------------------------------------X

**MATSUMOTO, United States District Judge:**

        On January 5, 2019, Plaintiff Jose Guerrero
("Guerrero" or "Plaintiff"), who is a resident of the State of
New York, and Defendant Charles Loiacono ("Loiacono"), who is a
resident of the State of New Jersey and was driving a vehicle on
behalf of Defendant Costco Wholesale Corporation ("Costco" and
together with Loiacono, "Defendants"), were involved in a motor
vehicle collision on the Brooklyn Queens Expressway (the "BQE")
in Brooklyn, New York (the "Subject Collision").  Costco is "a
corporation duly organized and existing under and by virtue of
the laws of the State of Washington."  (ECF No. 1 ¶ 11.)
Plaintiff alleges that he sustained personal injuries resulting
from the Subject Collision and, on April 8, 2019, Plaintiff
commenced this action, asserting claims sounding in negligence
and claims for damages in the amount of $10,000,000.00, in the
Supreme Court of the State of New York, Kings County, against

1

Defendants Loiacono and Costco.  (ECF Nos. l-1, "Complaint"; 1-5).  On November 5, 2019, Defendants removed the pending State action to this Court.  (ECF No. 1.)  The Court has diversity jurisdiction over this matter, pursuant to 28 U.S.C. § 1332(a).

Before the Court is Plaintiff's motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56, on the issue of liability.  (*See generally* ECF Nos. 28-3, "Ptf. Mot.", 30, "Ptf. Reply".)  Plaintiff asserts that Defendants' alleged negligence was the sole proximate cause of the Subject Collision, and that Defendants violated New York Vehicle and Traffic Law ("VTL") §§ 1128(a) and 1163(a).  (*Id.*)  Defendants oppose Plaintiff's Motion for Summary Judgment, asserting that these are disputed issues of material fact as to negligence, comparative negligence, and proximate cause.  (ECF No. 29-5, "Def. Opp.")  For the reasons set forth below, Plaintiff's Motion for Summary Judgment is **DENIED**.

## I.   FACTUAL BACKGROUND

The Court has considered the facts set forth below from the parties' declarations and exhibits attached thereto, as well as Plaintiff's Rule 56.1 Statements of Fact, Plaintiff's Supplemental Rule 56.1 Statements of Fact, and Defendants' Responses to Plaintiff's Rule 56.1 Statements of Fact.  The Court reviews these facts in the light most favorable to the nonmoving party, Defendants.  *See Capobianco v. City of New*

*York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005).  Except as otherwise noted, the facts recited herein are undisputed by the parties.

The Subject Collision took place on January 5, 2019, on the three-lane Gowanus Expressway section of the BQE in Brooklyn, New York.  (ECF No. 29-6, Def. Opp. Ex. 6, "56.1 Stmt. of Facts" ¶¶ 1, 6.)  At the time of the Subject Collision, Loiacono was operating a tractor-trailer bearing an Indiana license plate with the number CW036, which was owned by Costco, and which Loiacono was driving in the course of his employment by Costco.  (56.1 Stmt. of Facts ¶¶ 2 – 4.)  Loiacono was driving Defendants' tractor-trailer in the center lane of the three-lane section of the BQE immediately prior to the Subject Collision.  (56.1 Stmt. of Facts ¶ 8.)  Guerrero was driving a 2016 Acura TLX bearing a New York State license plate with the number JEZ7550 in the furthest right lane of the three-lane section of the BQE at the time of the Subject Collision.  (ECF No. 28-6, Ptf. Mot. Ex. 6, "Guerrero Depo. Tr." 27:12 – 28:8.)  A third vehicle, a 2012 Ford Mustang bearing a New York State license plate with the number HYA7348, which was operated by non-party Khaled Hammam ("Hammam"), was also driving in the far-right lane, ahead of Guerrero, and was involved in the Subject Collision.  (ECF No. 28-11, Ptf. Mot. Ex. 11, "Hammam Depo. Tr." 15:2 - 5.)  By the end of the Subject Collision, Defendants' tractor-trailer had come into contact with both Hammam's

3

vehicle, which came into contact with the front of Defendants
tractor-trailer, and Guerrero's vehicle, which was wedged
between the back of Defendants' tractor-trailer and the
guardrail of the BQE.  (ECF No. 28-5, Ptf. Mot. Ex. 5, "Police
Accident Report" at p. 5.)

The parties' accounts as to the material facts
surrounding the Subject Collision are in dispute as follows.
The parties dispute how the Subject Collision occurred,
including the events leading up to the Subject Collision, the
precautions alleged to have been taken by each of the three
drivers to avoid the Subject Collision, the positioning and
speed of the three vehicles as they came into contact, and, most
saliently, the proximate cause of the Subject Collision.

**A. Precautionary Actions Prior to the Subject Collision**

Defendants assert that Loiacono took several
precautionary measures before attempting to move Defendants'
tractor-trailer into the right lane from the middle lane.
Loiacono stated, in his sworn affidavit, that Defendants'
tractor-trailer "was equipped with multiple mirrors which
allow[ed] [him] to see what is next to the right side of
[Defendants' tractor-trailer] as well as back past the entire
length of the trailer" and that Loiacono determined, by looking
at his mirrors, "that there were no vehicles in the right lane
next to [Defendants'] tractor trailer" before attempting to

4

change lanes.  (ECF No. 29-4, Defs. Opp. Ex. 4, "Loiacono Decl."
¶ 8.)  Loiacono asserted that his "blinker was signaling [his]
intent to change lanes for about 10 seconds before [he] actually
began to start the lane change."  (*Id.*)  Loiacono's statements
in his sworn affidavit are also supported by his deposition
testimony.  Loiacono testified that in the seconds leading up to
the Subject Collision, as is his typical practice, he checked
his mirrors to confirm there was no oncoming traffic, waited ten
seconds, and "look[ed] in the front [to] make sure the lane is
clear, again, before actually" changing lanes.  (ECF No. 28-8,
Ptf. Mot. Ex. 8, "Loiacono Depo. Tr." 27:3 – 21.)  When asked at
his deposition "where [his] eyes [were] looking" as he "began
changing from the center lane to the right lane," Loiacono
testified that he looked "first . . . to the front, and then to
the right" and that he checked the road ahead of him and to the
right of him *after* signaling his intention to change lanes with
directional lights for a total of ten seconds.  (Loiacono Depo
Tr. 31:25 – 32:5) (emphasis added).  Loiacono also noted that
"before [he] even put [his] blinker on, [he] check[ed] [his]
mirrors to make sure it [was] safe."  (Loiacono Dep. Tr. 26:20 –
27:8.)  Loiacono testified that after checking his mirrors, he
"put [his] blinker on, check[ed] [his] mirrors again," looked to
the front and the right, and then "proceed[ed] . . . into the

next lane" having determined that "it's safe."  (Loiacono Dep. Tr. 27:3 – 11.)

Loiacono repeated his testimony regarding this sequence of precautionary actions several times throughout his deposition, including in confirming what he told the police who reported to the scene of the Subject Collision, and recounting what he told his supervisors and the driver review panel that ultimately found he was not at fault for the accident. (Loiacono Dep. Tr. 51:15 – 52:6) ("Q: I'm going to read you some of the accident description/officer's notes. It says, [Loiacono] states while on the middle lane . . . he attempted to make a lane change onto far right lane, placing turn signal before attempting lane change when [Hammam's] vehicle [] and [Guerrero's] vehicle [] sped up on the far right lane, causing [the two vehicles] to collide into [Defendants' tractor-trailer]. Is that what you told the police?  A: Yes"); (Loiacono Dep. Tr. 54:20 - 24) ("I told [supervisor John Cane] that I was switching lanes from center to right lane, checked the side mirrors, made sure it was safe, put my blinker on, looked once or two more times, and started to make my lane change.")

Although Plaintiff does not dispute that Loiacono turned on his directional lights to signal his intended lane change, when asked whether he saw the directional lights, Guerrero testified that he did not.  (Guerrero Depo. Tr. 38:24 –

6

39:1.)  Guerrero testified that in the time period leading up to
the Subject Collision, he changed lanes on the BQE "twice,"
first "from the left lane to the middle lane," where he remained
for "maybe ten seconds," and then from the middle lane to the
right lane where he remained for "maybe 30 seconds to a minute"
before the Subject Collision occurred.  (Guerrero Dep. Tr. 33:5
– 17.)  Although Guerrero testified that he was "ten cars"
behind Defendants' tractor-trailer when he "first switched to
the right lane" and that prior to switching into the right lane
(when he was still in the middle lane) Guerrero could see that
"the exterior lights of the truck" were on, Guerrero did not
observe directional lights signaling Loiacono's intended
movement of Defendants' tractor-trailer at any point prior to
the Subject Collision.  (Guerrero Depo. Tr. 38:18 – 39:1.)
Guerrero admits, however, that he was overtaking the Defendants'
tractor-trailer from the far-right lane.  (Guerrero Depo. Tr.
42:17 – 43:14.)  Non-party Hammam also testified that he did not
observe Loiacono's direction lights.  (Hammam Depo Tr. 22:8 –
12.)

## B. The Parties' Assertions Regarding the Vehicles' Speed Leading up to the Subject Collision

          Loiacono testified that as he prepared to move
Defendants' tractor-trailer into the right lane, he maintained
approximately the same speed.  (Loiacono Depo. Tr. 26:8 – 10,

35:16 – 19.)  Loiacono stated that he was moving at an
approximate speed of "41" miles per hour on the BQE on the day
of the Subject Collision.  (Loiacono Depo. Tr. 26:4 – 10.)
According to Loiacono, "when [he] began changing lanes from the
center lane to the right lane," his "rate of speed was . . . 39
to 41" miles per hour.  (Loiacono Depo. Tr. 35:16 – 19.)

        Guerrero, however, testified that Loiacono was
travelling at approximately 30 to 35 miles per hour until
Loiacono attempted to change lanes, at which point "the truck
slowed down . . . [by] maybe 5 to 10 miles [per] hour," such
that Guerrero "was going faster than the truck" and was
"overtaking the truck" even though Guerrero's vehicle did not
"accelerate[.]"  (Guerrero Depo. Tr. 42:17 – 43:12.)  Guerrero
testified that "when [he] saw the truck begin to move," Guerrero
was moving at a constant approximate speed of "40 miles an
hour."  (Guerrero Depo. Tr. 47:17 – 21.)

        By contrast, Hammam testified that both he and
Plaintiff were travelling "at, like, 50 miles an hour, give and
take" leading up to the Subject Collision.  (Hammam Depo Tr.
19:14 – 20:3.)  Contrary to Guerrero's testimony that neither he
nor Hammam accelerated their speed in order to overtake
Defendants' tractor-trailer, Hammam testified that "we
[Plaintiff and Hammam] were [] passing through" the right lane,
that he initially sought to change into the right lane because

it was "moving quicker" and he could accordingly "pass[]"
through," and that Hammam "was almost, like, [past]" Defendants'
tractor-trailer" at the time of the Subject Collision.  (Hammam
Depo. Tr. 19:14 – 20:12.)  Hammam testified that he was driving
his vehicle at "50 miles per hour" right before the Subject
Collision and Defendants' tractor-trailer was driving at
approximately 45 miles per hour or "maybe five miles less [than
Hammam], give or take."  (Hammam Depo. Tr. 29:22 – 30:8.)

### C. Defendants' Tractor-Trailer's Contact with Hammam's Vehicle

The parties, as well as non-party Hammam, also present
conflicting accounts of both the positioning of Hammam's vehicle
and Hammam's actions immediately prior to the Subject Collision.
Plaintiff asserts that Hammam's vehicle was in the furthest
right lane, adjacent to Defendants' tractor-trailer, when the
tractor-trailer attempted to enter into the right lane, at which
point Loiacono "collide[d] with [Hammam's] vehicle," which was
driving immediately ahead of Guerrero's vehicle.  (ECF No. 29-6,
Def. Opp. Ex. 6, "56.1 Stmt. of Facts" ¶ 10.)  Defendants'
dispute Plaintiff's account, citing Loiacono's deposition
testimony that just before the Subject Collision, Hammam's
vehicle attempted to cut from the right lane into the center
lane in front of Defendants' tractor-trailer and clipped the
front of the tractor-trailer.  (Loiacono Depo. Tr. 36:9 – 14,
51:15 – 52:6, 57:13 – 25); (Guerrero Depo. Tr. 39:22 – 40:24,

42:25 - 43:14.)   Plaintiff asserts that Hammam's vehicle was
"traveling in the right lane when Defendants' tractor-trailer
suddenly merged into [Hammam's] lane of travel, thereby causing
the [Subject Collision]."   (Ptf. Mot. at p. 9)(citing Guerrero
Depo. Tr. 41:20 – 25) ("the head of the truck [Defendants'
tractor-trailer] . . . collided with the car in front of me
[Hammam's vehicle]".)   Guerrero testified that "right before the
impact," he saw Hammam's "left [directional] signal come on as
he was to merge into the center lane."   (Guerrero Depo. Tr.
39:22 – 40:6.)   Guerrero further testified that between the time
that he observed Hammam "turn [his] directional signal on and
the [time of the] impact between the truck" and Hammam's
vehicle, "maybe a second [or] 2" had passed, and that "almost a
split second" elapsed between the point at which he saw
Defendants' tractor-trailer "begin to move until the point where
the actual contact occurred between the truck and [Plaintiff's]
vehicle."   (Guerrero Depo. Tr. 48:12 – 49:24.)   Guerrero also
testified that the time between "the contact between [Hammam's
vehicle] and the front of the truck and [the] time when there
was a contact between the truck and [Plaintiff's] car" amounted
to "almost a split second."   (*Id.*)

Hammam testified that after changing lanes from the
left lane to the middle lane, and again from the middle lane to
the right lane, his vehicle and "the gray Acura [Plaintiff's

10

vehicle], [which] was right behind [him], [were] right within
the 18-wheeler [Defendants' tractor-trailer]" and that Hammam
was positioned "at the first-third of [Defendants' tractor
trailer]" when "all of the sudden, the 18-wheeler started just
merging on top of us." (Hammam Depo. Tr. 18:13 – 19:9.) Hammam
stated that he first "saw [Defendants' tractor-trailer] before
[he] merged" into the right lane, when he was still "in the
middle lane" and that he decided to move into the right lane
because he believed the traffic in the right lane was "moving
quicker." (Hammam Depo. Tr. 19:14 – 18.) Hammam further
testified that after merging into the right lane "a few cars
behind" Defendants' tractor-trailer, he "and the car behind,"
which presumably refers to Plaintiff's vehicle, "kept going" in
an attempt to pass Defendants' tractor-trailer and that both he
and Plaintiff's vehicle were moving at "50 miles an hour."
(Hammam Depo Tr. 19:19 – 20:12.) Hammam later affirmed that
"[he] saw the truck for the first time when [he] switched to the
right lane, and it was three to five car lengths ahead of [him]
in the center lane," although Hammam was, by this point, "in the
right lane." (Hammam Depo Tr. 35:14 – 19.) Hammam stated that
at this time, "there [were no] vehicles" ahead of him in the
right lane and that "it was clean – clear . . . That's why
[Loiacono] was merging, because it was clear." (Hammam Depo.
Tr. 35:22 – 36:2.) Hammam further stated that because he

"didn't see any turn signals," he passed "the rear end of [Defendant's] tractor-trailer" and continued driving forward to pass Defendants' tractor-trailer, at which point Loiacono merged into the right lane where Hammam's vehicle and Plaintiff's vehicle were located.  (Hammam Depo. Tr. 36:10 – 19.)

Defendants allege that Hammam's vehicle "clipped" the right front of Defendants' tractor-trailer as Hammam attempted to pass Defendants' tractor-trailer on the right side and change into the center lane from the right lane, in front of Defendants' tractor-trailer.  *See* (Loiacono Decl. ¶ 10) (Hammam's vehicle "came up on [Loiacono's] right side and clipped the right front of [Defendants' tractor-trailer]"); (Loiacono's Depo. Tr. 52:9 - 16)("the first car [Hammam's vehicle] tried to get past [Defendants' tractor-trailer] and slide over to the center lane, and he clipped the side" of Defendants' tractor-trailer in the process.)  Defendants contend that the Subject Collision began when Hammam's vehicle was in the process of changing lanes from the right lane into the center lane in front of Defendants' tractor-trailer, in an attempt to overtake Defendants' tractor-trailer, and "clipped the front of [Defendants'] tractor trailer."  (56.1 Stmt. of Facts ¶ 10.)  Loiacono testified that Hammam "came up on the side [of Defendants' tractor-trailer] and clipped the front of the truck."  (Loiacono Depo. Tr. 28: 2 - 3.)  Hammam disputes

12

Loiacono's assertion that Hammam was attempting to re-enter the center lane at the time of the Subject Collision, (Hammam Depo. Tr. 39:25 – 40:7) ("because I had the clear of way in the right lane . . . I could have kept going straight . . . I didn't have the intention to make it back [to the center lane]") although Plaintiff testified that "right before the impact," he witnessed Hammam's "left signal come on." (Guerrero Depo. Tr. 39:22 – 40:6.) Loiacono testified that he did not witness Hammam speed up, but pointed to a picture of Defendants' tractor-trailer depicting "the tandems . . . off the ground" and explained that "the two back tires on the side where the [Subject] Collision happened . . . [were] off the ground" such that Guerrero could only have ended up "wedged in there" if he had attempted to speed up since "there's no way, at 40 miles" per hour, that Guerrero could have ended up in that position. (Loiacono Dep. Tr. 52:19 – 53:17.)

Although Plaintiff disputes Defendants' assertion that Hammam sped up to overtake Defendants' tractor-trailer and cites Hammam's testimony to contend that only "*after* [Hammam] was initially hit by the Defendants' tractor-trailer, [did Hammam attempt[] to speed up past the Defendants' vehicle to avoid being completely crushed," (Ptf. Mot. at p. 19) (emphasis added) Guerrero testified that Hammam's vehicle was driving up to 15 miles per hour faster than Defendants' tractor-trailer "right

13

before [Plaintiff saw] the truck move" into the right lane, (Guerrero Depo. Tr. 43:10 – 14.) Hammam further testified that both he and Plaintiff were attempting to overtake Defendants' tractor-trailer, which was in the middle lane, adjacent to a portion of the right lane that did not have any cars in it and in front of Hammam's vehicle and Plaintiff's vehicle. (Hammam Depo. Tr. 35:20 - 36:19) ("that's why he was merging, because it was clear . . . I didn't see turn signals so I though he's staying in his lane.")

## D. Defendants' Tractor-Trailer's Contact with Plaintiff's Vehicle

According to Plaintiff's deposition testimony, by the time he observed Hammam's vehicle come into contact with Defendants' tractor-trailer, Guerrero was "by the tip of the bed" or "by the very rear" of Defendants' tractor-trailer. (Guerrero Depo. Tr. 40:12 – 21.) Guerrero testified that he "was going faster than the truck" and had begun "overtaking the truck" although he maintained that he did not accelerate. (Guerrero Depo. Tr. 42:17 – 43:12) ("the truck decelerated . . . [Loiacono] slowed down . . . maybe 5 to 10 miles an hour" such that Guerrero was "overtaking the truck.") Guerrero also testified that he was "maintaining the same distance" with Hammam's vehicle throughout the time period leading up to the Subject Collision and that Hammam's vehicle was moving at

14

approximately "40 to 45" miles per hour.  (Guerrero Depo. Tr. 43:13 – 17.)  Guerrero testified that "almost a split second" after coming into contact with Hammam's vehicle, Defendants' tractor-trailer came into contact with Plaintiff's vehicle, and Plaintiff applied "hard" pressure to the breaks, though he did not apply the "maximum brake pressure."  (Guerrero Depo. Tr. at 47:17 – 48:19.)  Guerrero added that he "sound[ed] his horn" and attempted to "turn the wheel of [his] vehicle a little bit" to "move over to the right."  (Guerrero Depo. Tr. 48:20 – 49:2.)

Hammam testified that Defendants' tractor-trailer came into contact with both his vehicle and Plaintiff's vehicle at the same time.  (Hammam Depo. Tr. 23:18 – 24:6) ("it was all just one big hit.")  Hammam described the passenger vehicles as having been "sandwich[ed]," noting that "it was literally like how you hit a sandwich[,] you sandwich something[,] like I literally . . . just got squished out . . . and the other car [Plaintiff's vehicle] was, like, stuck in between the truck and . . . the rail."  (*Id.*)  Hammam testified that the first time he noticed Plaintiff's vehicle was "when the truck was hitting us because Hammam "didn't look behind [him] before the incident started to happen . . . [he] didn't, like see, what was behind [him]."  (Hammam Depo. Tr. 39:7 – 15.)

Defendants allege that, like Hammam, Plaintiff attempted to speed up in the right lane, in order to overtake

Loiacono, which resulted in the right-side tires on Defendants'
tractor-trailer and the left side of Plaintiff's vehicle coming
into contact.  (56.1 Stmt. of Facts ¶ 33.)  Loiacono testified
that "he [came] to realize that [he] [was] in an accident" at
the time that Hammam's vehicle "came up on the [right] side [of
him] and clipped the front of the [tractor-trailer]," noting
that Hammam's vehicle "spun sideways . . . with the driver's
side facing perpendicular to the truck."  (Loiacono Dep. Tr.
27:22 – 28:17.)  When asked if he could feel the impact of
Hammam's vehicle making contact with Defendants' tractor-
trailer, Loiacono explained that, given the fact that the
Defendants' tractor trailer weighed "75,000 pounds, . . . you
really don't feel much. Just – that's the nature of the
vehicle."  (Loiacono Dep. Tr. 29:4 – 7.)  Loiacono testified
that Guerrero's vehicle came into contact with Defendants'
tractor-trailer "on the tandems of the trailer and the guardrail
. . . 8 feet forward from the tail," and that he neither felt
nor heard the impact.  (Loiacono Depo. Tr. 30:3 – 31:15.)
Loiacono learned that Guerrero's vehicle had also come into
contact with Defendants' tractor-trailer "after [] all [three
vehicles] came to a stop . . . [and Loiacono] got out of the
[tractor-trailer] and [] went to stand next to the guardrail."
(*Id.*)

   **E. The Time Period after the Subject Collision**

16

After the Subject Collision, police reported to the
scene and a Police Accident Report, submitted as Exhibit 5 to
Plaintiff's motion for summary judgment, was prepared by Police
Officer Abed A. Hamdan.  (Police Accident Report at p. 3.)  The
Court considers the Police Accident Report not for the truth of
its contents, but to confirm the parties' and non-party Hammam's
conflicting narratives regarding the Subject Collision in the
following description:

> AT T/P/O DRIVER OF VEHICLE 1 [Hammam] STATES HE WAS
> TRAVELING STRAIGHT E/B [east-bound] ON GOWANUS
> EXPRESSWAY ON THE FAR RIGHT LANE WHEN VEHICLE 3
> [Loiacono] MERGED FROM THE MIDDLE LANE TO THE RIGHT LANE
> CAUSING DAMAGE TO VEHICLE 1. DRIVER OF VEHICLE 2
> [Guerrero] STATES HE WAS TRAVELING E/B ON THE FAR RIGHT
> LANE WHEN VEHICLE 3 MERGED FROM THE MIDDLE LANE TO THE
> RIGHT LANE CAUSING DAMAGE TO VEHICLE 2. DRIVER OF VEHICLE
> 3 STATES HE WAS ON THE MIDDLE LANE TRAVELING E/B. DRIVER
> OF VEHICLE 3 FURTHER STATES WHILE ON THE MIDDLE LANE HE
> ATTEMPTED TO MAKE A LANE CHANGE ONTO THE FAR RIGHT LANE,
> PLACING RIGHT TURN SIGNAL BEFORE ATTEMPTING, LANE CHANGE
> WHEN VEHICLE 1 AND VEHICLE 2 SPED UP ON THE FAR RIGHT
> LANE CAUSING VEHICLE 1 AND VEHICLE 2 TO COLLIDE INTO
> VEHICLE 3. MOS DID NOT WITNESS ACCIDENT.

(Police Accident Report at pp. 1, 3.)

Loiacono testified that following the Subject
Collision, he was given three (3) days off from work, during
which Costco conducted "a driver review . . . [where] they bring
three drivers over with the supervisor and go over the accident
and the other drivers determine[] what course of punishment"
might be warranted.  (Loiacono Dep. Tr. 41:15 – 42:4.)  Loiacono
explained that he "was cleared" following the driver review and

17

that the three reviewing drivers involved in the review
determined that the Subject Collision "was not [his] fault."
(Loiacono Dep. Tr. 42:5 – 13.)  Loiacono testified he was later
on paid leave for two weeks, although it's not clear if the two-
week leave was related to investigative efforts regarding the
Subject Collision by Costco, or if there was some other basis
for Loiacono's leave.  (Loiacono Dep. Tr. 56:22 - 25) ("they had
to put me on paid leave until corporate investigates what they
had to investigate.")

## LEGAL STANDARD

### I.   Summary Judgement

Federal Rule of Civil Procedure 56(a) dictates that a
"court shall grant summary judgment if the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  "A fact is
'material' for these purposes when it 'might affect the outcome
of the suit under the governing law.'"  *Rojas v. Roman Catholic
Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  No
genuine issue of material fact exists "unless there is
sufficient evidence favoring the nonmoving party for a jury to
return a verdict for that party."  *Anderson*, 477 U.S. at 249.
"If the evidence is merely colorable, or is not significantly

18

probative," a Court may grant summary judgment. *Id.* at 249 – 50 (internal citations omitted).

When bringing a motion for summary judgment, the burden of demonstrating the absence of any disputed issues of material fact lies with the moving party. *Rojas*, 660 F.3d at 104. A moving party may indicate the absence of a factual dispute by "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). In deciding a summary judgment motion, the Court "must resolve all ambiguities and draw all reasonable inferences against the moving party." *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 83 (2d Cir. 2001) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Once the moving party has met its burden, in order to avoid judgment as a matter of law, the nonmoving party "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial[.]" *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). The nonmoving party must point to "evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." *Id.*

Finally, the Court will decide whether, drawing all inferences in favor of the nonmoving party, the evidence would "permit a reasonable juror to find for the party opposing the motion." *Figueroa v. Mazza*, 825 F.3d 89, 98 (2d Cir. 2016).

## II. Alleged Violations of New York Law

Plaintiff asserts a cause of action sounding in negligence, and also asserts violations of New York Vehicle and Traffic Law ("VTL") §§ 1128(a) and 1163(a) by the Defendants.

### A. Negligence Under New York Law

Under New York law, in order "[t]o establish a prima facie case of negligence . . . a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 286 (2d Cir. 2006) (internal citations and quotations omitted). "New York law imposes on operators of motor vehicles a duty of reasonable care taking into account the circumstances of the situation." *Velasquez v. United States Postal Service*, 155 F. Supp. 3d 218, 227 (E.D.N.Y. 2016) (internal citations omitted). "[T]he New York Vehicle and Traffic Law ("VTL") and 'principles of liability under New York law impose a duty upon drivers to operate their vehicles with reasonable care taking into account the actual and potential dangers existing from weather, road, traffic and other conditions." *Laidlaw v. United States*, 16-CV-

4681, 2019 WL 1313919, at *10 (E.D.N.Y. Mar. 22, 2019).  "[W]hen a defendant violates a statute that defines the degree of care to be used under certain circumstances, the violation constitutes negligence *per se* if (1) it causes the injury, (2) the plaintiff is a member of the class intended to be benefited by the statute, and (3) the statute is intended to protect against the very hazard that caused the plaintiff's injury." *Vaselli v. U.S.*, 12-CV-6221, 2014 WL 4961421, at *4 (E.D.N.Y. Oct. 3, 2014) ("[A] violation of the VTL constitutes negligence per se").

### B. New York Vehicle and Traffic Law

VTL § 1128(a) dictates that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."  VTL § 1163(a) prohibits a driver from "mov[ing] [a vehicle] right or left upon a roadway unless and until such movement can be made with reasonable safety[.]"  "When read together, it is evident that the VTL imposes upon a driver a duty to operate a motor vehicle within a designated lane, to signal prior to changing lanes or turning, and to change lanes or turn only when it is safe to do so . . . and to see that which [he] should have seen by the proper use of [his] senses." *Machuca-Gonzalez v. Bost*, 14-CV-8690, 2017 WL 5907927, at *2 (S.D.N.Y. Nov. 27, 2017).

21

"Generally, whether a driver has conformed to the requisite standard of due care is a question of fact necessitating a trial." *Jin Yue You v. Pedro Teixeira, Inc.*, 17-CV-6028, 2020 WL 2732032, at *2 (S.D.N.Y. May 26, 2020).

## DISCUSSION

Plaintiff asserts that "Defendants' negligence was the sole proximate cause" of the Subject Collision. (Ptf. Mot. at p. 6.) Specifically, Plaintiff alleges that the Subject Collision "occurred when Defendants' tractor-trailer merged from the center lane of the [BQE] to the right lane while it was not safe to do so in violation of New York Vehicle Traffic Law §§ 1128(a) and 1163(a)." (*Id.*) Defendants, however, assert that Loiacono took the proper measures to "determine[] that he could make the lane change safely" and that the Subject Collision occurred when Hammam, in attempting to overtake Loiacono, sped up and "clipped the right front of [Defendants' tractor-trailer]" as Loiacono attempted to change lanes, and that Plaintiff was also "attempting to pass [Defendants' tractor-trailer]." (Defs. Opp. at 4 – 5.) In support of their conflicting accounts, the parties primarily point to conflicting deposition testimony by Loiacono, Guerrero and Hammam, as well as the Police Accident Report, which reflects the parties' disputed accounts as to how the Subject Collision occurred. "Sharp conflicts of evidence regarding the circumstances of a

22

vehicle collision present questions of fact and credibility that properly belong to the jury." *Son v. Lockwood*, 07-CV-4189, 2008 WL 5111287, at *5 (E.D.N.Y. Nov. 26, 2008) (internal citations omitted). "As outlined above, nearly all of the factual circumstances regarding the [Subject Collision] . . . are sharply disputed by the parties." *Son*, 2008 WL 5111287, at *5.

Plaintiff alleges that Loiacono acted negligently because (1) the Subject Collision occurred as a result of Loiacono's attempt to move Defendants' tractor-trailer into the right lane, (2) because Loiacono did not see Guerrero's vehicle or Hammam's vehicle when moving into the right lane, (3) because Loiacono waited ten seconds from when he last checked his mirrors and was looking straight ahead as he attempted to move Defendants' tractor-trailer into the right lane, thereby attempting to change lanes without determining that it was safe to do so, and (4) because Loiacono didn't realize that he was involved in the Subject Collision until after the impact had occurred. Finally, Plaintiff disputes Defendants' assertion that Hammam and Guerrero "sped-up" to overtake Loiacono in the time period leading up to the Subject Collision as "nothing more than fanciful conjecture and speculation[.]" (Ptf. Mot. at p. 15.)

The Court finds that Plaintiff's assertion that the Subject Collision occurred as Loiacono attempted to move

Defendants' tractor-trailer into the right lane, is a disputed
issue of material fact.  Defendants allege that, "[j]ust before
the [Subject] Collision, [Hammam's vehicle] overtook [] and
clipped [Defendants'] tractor-trailer," (56.1 Stmt. of Facts ¶
9) and that both "[Hammam's] vehicle and plaintiff attempted to
overtake [] Defendants' tractor-trailer on the right."  (56.1
Stmt. of Facts ¶ 11.)  Defendants' assertion is supported by
Loiacono's deposition testimony, declaration, and
contemporaneous statements to the police officer who responded
to the scene of the Subject Collision.  (Police Accident Report
at p. 1 - 3) ("Driver of Vehicle 3 [Defendants' tractor-trailer]
states he was on the middle lane traveling e/b. Driver of
Vehicle 3 further states while on the middle lane he attempted
to make a lane change onto the far right lane, placing right
turn signal before attempting lane change when Vehicle 1
[Hammam's vehicle] and Vehicle 2 [Plaintiff's vehicle] sped up
on the far right lane causing Vehicle 1 and Vehicle 2 to collide
into Vehicle 3").  The Police Accident Report reflects
Guerrero's and Hammam's accounts of the Subject Collision, which
conflict with Loiacono's account.  (*Id.*) ("Driver of Vehicle 2
states he was traveling e/b on the far right lane when vehicle 3
merged from the middle lane to the right lane causing damage to
vehicle 2").  Moreover, Defendants claim that the Subject
Collision occurred when Hammam attempted to "cut into the center

24

lane," ahead of Defendants' tractor-trailer.  (Defs. Opp. at pp. 4 – 5.)  This, too, is disputed as Hammam disavowed any intention of moving leftward into the center lane, notwithstanding Guerrero's testimony that he witnessed Hammam signal a leftward turn with directional signal lights.  (Hammam Depo. Tr. 39:25 – 40:7); (Guerrero Depo. Tr. 39:22 – 40:6.)

Where "the parties' conflicting accounts of the accident is coupled with the police report showing the point of contact," such that the "record before the court suggests that the accident could have occurred in many ways, one version of which suggests that [Defendants' were] nonnegligent," Plaintiff has failed to make out a prima facie case of negligence. *Mangual v. Pleas*, 02-CV-8311, 2004 WL 736817, at *3 (S.D.N.Y. Apr. 6, 2004); see also *Joseph v. Kelly*, 115 N.Y.S. 3d 404, 406 (N.Y. App. Div. 2d Dep't 2019) (reversing the Supreme Court's grant of summary judgment in a personal injury action arising out of a three-car accident where the parties' and non-party's deposition testimony "presented conflicting testimony as to the fact[s] surrounding the accident" and specifically as to which vehicle was responsible for initiating the collision).

Plaintiff's second and third assertions are interrelated.  Accordingly, the Court will address them together.  Plaintiff's second assertion, that Loiacono did not see Guerrero's vehicle or Hammam's vehicle when moving into the

25

right lane, is also disputed.  (56.1 Stmt. of Facts ¶ 26.)

Specifically, the parties dispute whether Loiacono failed to see

that Guerrero's vehicle and Hammam's vehicle were in the right

lane, adjacent to Defendants' tractor-trailer in the middle

lane, when Loiacono began his attempt to change lanes from the

middle to the right, or whether Loiacono could not see

Guerrero's vehicle and Hammam's vehicle because those two

vehicles were not adjacent to Defendants' tractor-trailer at

that time.  Plaintiff alleges, in his third assertion, that

Loiacono "failed to see that which through the proper use of his

[] senses he [] should have seen," *Katanov v. County of Nassau*,

936 N.Y.S. 2d 285, 287 (N.Y. App. Div. 2d Dep't 2012), because

he "waited ten (10) seconds from when he last checked his

mirrors" and was "looking ahead" when attempting to move into

the right lane, (Ptf. Mot. at p. 8 – 9).  Plaintiff's assertion

that Loiacono conceded he did not see Guerrero's vehicle and

Hammam's vehicle because he failed to exercise a duty to look

out for the two vehicles misconstrues Loiacono's deposition

testimony.[1]  *See Simpson v. City of New York*, 793 F.3d 259, 265

---

[1] At the October 24, 2022 Pre-Motion Conference, the Court repeatedly advised
Plaintiff's counsel that disputed issues of material fact would likely
preclude the award of summary judgment in Plaintiff's favor and discussed the
evidence presented in the parties' Pre-Motion Conference letters.
Nonetheless, Plaintiff proceeded with his summary judgment motion.  In his
motion, Plaintiff selectively quotes portions of Loiacono's deposition
testimony to assert that there is no dispute of material facts as to
Defendants' negligence because "in light of [Loiacono's] admissions from his
deposition, it is clear that Defendants were negligent for failing to see
what was there to be seen."  (Ptf. Mot. at p. 16.)  Plaintiff's repeated

26

(2d Cir. 2015) (finding that the Court must ask "not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented"). Loiacono testified in the time leading up to the Subject Collision, as is his typical practice, he checked his mirrors to confirm there was no oncoming traffic down past the entire length of the trailer, "check[ed] his mirrors to make sure it [was] safe," deployed his right turn signal, waited ten seconds, and "look[ed] in the front [to] make sure the lane is clear, again, before actually" changing lanes. (Loiacono Depo. Tr. 27:3 – 21.) When asked "where [his] eyes [were] looking" as he "began changing from the center lane to the right lane," Loiacono stated that he looked "first . . . to the front, and then to the right" and that he checked the road ahead of him and to the right of him *after* signaling his intention to change lanes with directional lights for a total of ten seconds.

_____

assertion that "Defendant Loiacono [] admitted that ten (1) seconds elapsed from when [Loiacono] last checked his mirrors to him beginning to change lanes[,]" and that "Loiacono admitted that he looked to his front as he was changing lanes," ignores Loiacono's deposition testimony that "before [he] even put [his] blinker on, [he] check[ed] [his] mirrors to make sure it is safe [and then he] put his blinker on, check[ed] [his] mirrors again," waited ten seconds after putting his blinkers on, "looked in the front and [made] sure the lane [was] clear," and that as he began to attempt to change lanes, his eyes were "first . . . looking to the front, and then to the right." (Loiacono Depo. Tr. 27:3 – 21, 31:25 – 32:5.) Plaintiff may not selectively quote Defendant Loiacono's deposition testimony and ignore the portions of Loiacono's deposition testimony that raise a disputed material fact in order to assert that no such dispute exists. *Cf. Grant v. Roche Diagnostic Corp.*, 09-CV-1540, 2011 WL 3040913, at *9 (E.D.N.Y. Jul. 20, 2011) ("Plaintiff has selectively chosen only the evidence that supports his argument, to the exclusion of the remainder of the record which suggests otherwise.")

(Loiacono Depo Tr. 31:25 – 32:5).   Loiacono's testimony is
supported by Defendants' assertion that Loiacono did not see
Guerrero's vehicle or Hammam's vehicle when first attempting to
move into the right lane, because "the two vehicles were not in
the right lane next to [Defendants' tractor-trailer] when
[Loiacono] started his lane change and it was safe to do so."
(Defs. Opp. at p. 7.)   Furthermore, Hammam testified that "there
[were no] vehicles" ahead of Loiacono in the right lane and that
"it was clean – clear . . . that's why [Loiacono] was merging,
because it was clear."   (Hammam Depo. Tr. 35:22 – 36:3.)   "The
parties' conflicting accounts raise issues of material fact
involving, *inter alia*, the time interval(s) between the alleged
lane change and the chain reaction collisions and the sequence
of impacts between the three vehicles."   *Burchette v. Aklah*,
570723-02, 2002 WL 31663225 at *1 (N.Y. App. Div. 1st Dep't Nov.
14, 2002).

The Court finds that Plaintiff's fourth claim that
Loiacono was not aware that he was involved in the Subject
Collision until after the impact had occurred is not in dispute.
*See* Fed. R. Civ. P 56(e)(5); *Baity v. Kralik*, 51 F. Supp. 3d
414, 418 (S.D.N.Y. 2014) (collecting cases) ("responses [to a
56.1 statement of fact] that do not point to any evidence in the
record that may create a genuine issue of material fact do not
function as denials and will be deemed admissions of the stated

fact") (internal citation and quotation marks omitted).
Although Defendants claim "this is a disputed issue of material
fact," Defendants regurgitate their previously stated account of
the Subject Collision, no part of which addresses the factual
assertion that Loiacono was not aware that he was involved in
the Subject Collision until after the impact had occurred.
(56.1 Stmt. of Facts ¶ 60.)  Loiacono testified that he came "to
realize that [he was] in an accident . . . when [he] actually
saw the first driver's [Hammam's] face in [his] windshield,
because he came up on the side and clipped the front of the
truck so he spun sideways."  (Loiacono Depo. Tr. 27:22 - 28:17.)
Loiacono further testified that he did not realize that
Plaintiff was involved in the Subject Collision until "after
[they] all came to a stop . . . [and he] got out of the truck
and . . . went to stand next to the guardrail . . . [where he]
noticed the other vehicle in the back of the truck."  (Loiacono
Depo. Tr. 31:6 – 15.)  This testimony directly contradicts
Defendants' characterization of the factual statement in
paragraph 60 of Plaintiff's Rule 56.1 Statement of Facts, as
disputed.  In any event, the Court is not to weigh evidence or
make credibility determinations as such functions are for the
trial jury.

Finally, Plaintiff's characterization of Defendant's
account of the Subject Collision as "purely speculative," namely

Defendant's testimony that both Hammam and Plaintiff accelerated their vehicles in an attempt to overtake Defendants' tractor-trailer, is insufficient to meet Plaintiff's burden, as the moving party, of demonstrating "the absence of any disputed issues of material fact[.]" *Rojas*, 660 F.3d at 104.  Plaintiff asserts that the Subject Collision occurred when "Defendants' tractor-trailer suddenly merged into their lane of travel, thereby causing" the Subject Collision.  (Ptf. Mot. at p. 4.)  Defendants, however, assert that Loiacono took the proper measures to "determine[] that he could make the lane change safely" and that the Subject Collision occurred when Hammam, in attempting to overtake Loiacono, sped up and "clipped the right front of [Defendants' tractor-trailer]," and that Plaintiff was also "attempting to pass [Defendants' tractor-trailer]."  (Defs. Opp. at pp. 4 – 5.)  Hammam testified that he and Plaintiff were both behind Defendants' tractor trailer in the right lane and attempted to speed up to pass Defendants' tractor trailer.  (Hammam Depo. Tr. 19:14 – 20:12.)  Each of the three individuals involved in the Subject Collision, Guerrero, Loiacono, and Hammam, recounted different speeds at which the relevant parties were driving leading up to and during the Subject Collision.  *See* (Hammam Depo. Tr. 19:14 – 20:12) (Plaintiff's vehicle and Hammam's vehicle "were just driving normally at, like, 50 miles an hour, give or take" and Hammam sought to change into the

right lane because the right lane of traffic was "moving quicker"); (Guerrero Depo Tr. 42:17 – 43:12; 47:17 – 48:19) (Loiacono was moving "30 to 35 miles" per hour when slowing down "[by] maybe 5 to 10 miles [per] hour" and Guerrero was driving at "40 miles" per hour); (Loiacono Depo. Tr. 35:16 – 19, 51:15 – 53:3) (Loiacono's "rate of speed was . . . 39 to 41" miles per hour" when he began changing lanes, and Plaintiff's vehicle and Hammam's vehicle "sped up" to overtake Defendants' tractor-trailer prior to the Subject Collision).  Loiacono and Hammam both testified that Hammam's vehicle and Plaintiff's vehicle sped up with the intention of overtaking Defendants' tractor-trailer leading up to the Subject Collision, (Defs. Opp. at pp. 4 – 5; Loiacono Depo Tr. 51:15 – 53:3; Hammam Depo. Tr. 19:14 – 20:12) while Guerrero testified that Defendants' tractor-trailer decelerated as Loiacono merged into the right lane and that Guerrero did not accelerate with the intention of overtaking Defendants' tractor-trailer.  (Guerrero Depo. Tr. 42:17 – 43:12.)

There are significant factual disputes between Plaintiff's account of the Subject Collision as reflected in Guerrero's deposition, and Defendants' factual account of the Subject Collision.  Non-party Hammam's deposition testimony only inserts further confusion.  As evidenced by the deposition testimony of Loiacono, Guerrero and Hammam, the parties' Rule

56.1 Statements of Fact, and the Police Accident Report, the parties dispute several material facts bearing on liability, causation, and comparative negligence, including whether Loiacono signaled his intended rightward movement with directional lights, the direction in which Loiacono was looking or checking for clear road as he moved the Defendants' tractor-trailer into the right lane, whether Hammam and/or Guerrero were attempting to overtake Loiacono at the time of the Subject Collision, whether Hammam was seeking to merge into the center lane at the time of the Subject Collision, whether Loiacono decelerated as he attempted to merge into the right lane, and whether Hammam and Guerrero maintained their greater speed, or accelerated their speed as Loiacono attempted to move Defendants' tractor-trailer into the right lane.  Such numerous and fundamental disputes of material fact, in combination with a record replete with contradictory evidence, mandates that Plaintiff's motion for summary judgment be denied.  Accordingly, the Court finds that Plaintiff has failed to meet his burden of demonstrating that there are no genuine issues of material fact, and that the factual disputes discussed above are best reserved for determination by a jury.  A reasonable jury could conclude that Loiacono was not negligent in the Subject Collision, that his actions did not cause the Subject Collision, and that

Plaintiff was comparatively negligent.  Summary judgment is therefore denied.

Because this Court has determined that Plaintiff has not demonstrated an absence of genuine disputes of material fact regarding Defendants' negligence, the Court need not further address the parties' arguments regarding whether Plaintiff was comparatively negligent.

**CONCLUSION**

For the forgoing reasons, Plaintiff's motion for summary judgment is **DENIED.**

Plaintiff's counsel is directed to serve a copy of this Memorandum and Order, as well as a copy of the entire docket for this matter upon Plaintiff, and to file proof of service within three (3) business days of this Order.

The parties are directed to schedule a settlement conference with Magistrate Judge Sanket J. Bulsara, which "[a]ll lawyers who have appeared in the case (and have not been recused as counsel) must be present" for.  Magistrate Judge Sanket J. Bulsara, Settlement Conference Procedures § 4.

The parties are advised that additional failures to comply with Court orders, including Magistrate Judge Sanket J.

33

Bulsara's Orders and Practice Rules and this Court's Order may result in further sanctions.[2]


**SO ORDERED.**

Dated: August 24, 2023
        Brooklyn, New York



_____
KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York

---

[2] The docket reflects that Plaintiff's counsel/firm were sanctioned by the Court on January 27, 2023 for failure to comply with Court Orders.

34