UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------X

JOSE GUERRERO,

               Plaintiff,               **MEMORANDUM & ORDER**

                                  No. 19-cv-06239 (KAM)

    - against -                (SJB)

CHARLES LOIACONO and COSTCO
WHOLESALE CORPORATION,

               Defendants.

-----------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

    Before the Court are Defendants' pre-trial motions. (ECF Nos. 49, 52, 55, 58.) For the reasons below, the Court rules as follows:

- Defendants' motion to preclude Plaintiff's expert, Dr. Stanislav Avshalumov, D.O., from testifying as to Plaintiff's need for future knee replacement surgery is DENIED. (*See infra* Discussion Section I.A.)

- Defendants' motion to preclude Plaintiff's expert, Dr. George DiGiacinto, M.D., from testifying as to Plaintiff's likelihood of future surgery due to adjacent segment degeneration in the cervical and lumbar spine is GRANTED. (*See infra* Discussion Section I.B.)

- Defendants' motion to preclude Plaintiff's expert, Dr. Barry Root, M.D., from testifying as to Plaintiff's need

for future surgery and medical treatment as projected in
Dr. Root's "Life Care Plan" is DENIED. (*See* *infra*
Discussion Section I.C.)

- Defendants' motion to preclude Plaintiff's counsel from
referencing specific numerical figures for damages is
GRANTED IN PART and DENIED IN PART. (*See infra* Discussion
Section II.)

## BACKGROUND

The Court assumes familiarity with the underlying facts but
will briefly describe those relevant to the instant motions. The
Court refers to its Summary Judgment Memorandum and Order for
additional factual background. (*See* ECF No. 37.)

Jose Guerrero ("Plaintiff"), a New York resident, commenced
this action against Defendants Charles Loiacono ("Loiacono"), a
New Jersey resident, and Costco Wholesale Corporation ("Costco"),
a Washington State corporation with its principal place of business
in Washington, in the Supreme Court of Kings County, on April 8,
2019. (ECF No. 1, Petition for Removal ("Rem. Pet.") ¶¶ 2, 10-11.)

On January 5, 2019, Plaintiff and Loiacono, who was driving
a vehicle on behalf of Costco, were involved in a vehicle collision
on the Brooklyn Queens Expressway (the "BQE") in Brooklyn, New
York. (ECF No. 37 at 1.) Plaintiff asserts that Defendants were
negligent, and the alleged negligence was the sole proximate cause
of the collision, because Defendant Loiacono made an unsafe lane

2

change in violation of New York Vehicle and Traffic Law §§ 1128(a) and 1163(a). (*Id.* at 20.)

On November 5, 2019, Defendants timely removed this action to the Eastern District of New York under 28 U.S.C. §§ 1441 and 1446(b), following Plaintiff's October 31, 2019 response to an *Ad Damnum* Demand that clarified the amount in controversy exceeded $75,000, noting alleged sustained damages of approximately $10,000,000. (Rem. Pet. ¶¶ 6-17.) The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).

On August 24, 2023, this Court denied Plaintiff's motion for summary judgment on the issue of liability. (ECF No. 37.) In anticipation of trial, Defendants filed four pre-trial motions.

## LEGAL STANDARD

### I. Motions in Limine

"The purpose of a motion in limine is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence." *Hopkins v. Nat'l R.R. Passenger Corp.*, No. 08-cv-2965 (NGG) (RML), 2016 WL 8711718, at *2 (E.D.N.Y. Apr. 29, 2016); *see also Luce v. United States*, 469 U.S. 38, 40 n.2 (1984) (defining such motions as "any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered"). "Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds." *United States v.*

*Paredes*, 176 F. Supp. 2d 179, 181 (S.D.N.Y. 2001) (citation omitted). "[C]ourts considering a motion *in limine* may reserve decision until trial, so that the motion is placed in the appropriate factual context." *Jean-Laurent v. Hennessy*, 840 F. Supp. 2d 529, 536 (E.D.N.Y. 2011) (citation omitted). Further, a district court's ruling on a motion in limine is preliminary and "subject to change when the case unfolds." *Luce*, 469 U.S. at 41.

**II.  Federal Rule of Evidence 702**

Federal Rule of Evidence ("FRE") 702 states that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."

The proponent of expert testimony bears the burden of establishing by a preponderance of the evidence that FRE 702's

admissibility requirements are satisfied. *See United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court established the district court's gatekeeping role in assessing the admissibility of scientific evidence. *See id.* at 589. The gatekeeping role ensures that an "expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597. Further, the *Daubert* gatekeeping obligation applies "not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

Before permitting expert testimony under Rule 702, "the court must make the following findings: (1) the witness is qualified to be an expert; (2) the opinion is based upon reliable data and methodology; and (3) the expert's testimony on a particular issue will 'assist the trier of fact.'" *In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d 227, 242 (E.D.N.Y. 2022) (quoting *Nimely v. City of New York*, 414 F.3d 381, 396–97 (2d Cir. 2005)).

**A.    Witness Qualifications**

"Federal Rule of Evidence 702(a) permits a district court to admit the expert testimony of a witness 'who is qualified as an expert by knowledge, skill, experience, training, or education.'"

*United States v. Arslanouk*, 853 F. App'x 714, 718 (2d Cir. 2021). "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) (citation omitted). "Even if a proposed expert lacks formal training in a given area, he may still have 'practical experience' or 'specialized knowledge' qualifying him to give opinion testimony under Rule 702." *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 328 (S.D.N.Y. 2022) (citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995)).

**B.   Reliability**

Regarding reliability, "the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." *Williams*, 506 F.3d at 160 (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (internal quotation marks omitted)).

"Expert opinions based on insufficient facts or data, or on unsupported suppositions [are] not acceptable. Anecdotal evidence and 'generalized assumptions' are inadequate bases for an expert

report." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d at 284 (internal citations omitted). Further, "[e]xpert testimony should be excluded if it is 'speculative or conjectural.'" *In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d at 242 (quoting *United States v. Jones*, 965 F.3d 149, 162 (2d Cir. 2020)).

In *Daubert*, the Supreme Court enumerated factors "bearing on reliability that district courts may consider: (1) whether a theory or technique has been or can be tested; (2) 'whether the theory or technique has been subjected to peer review and publication;' (3) the technique's 'known or potential rate of error' and 'the existence and maintenance of standards controlling the technique's operation;' and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community." *Williams*, 506 F.3d at 160 (quoting *Daubert,* 509 U.S. at 593–94). The test of reliability is "flexible," and *Daubert's* factors are not exclusive; "[r]ather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co.*, 526 U.S. at 141–42 (emphasis in original) (citing *General Electric Co. v. Joiner,* 522 U.S. 136, 143 (1997)).

In turn, "*Daubert* instructs a district court to 'focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's

belief as to the correctness of those conclusions.'" *Bustamante v. KIND, LLC*, 100 F.4th 419, 427 (2d Cir. 2024) (citation omitted). However, "Rule 702 also requires that there be a sufficiently reliable connection between the methodology and the expert's conclusions for such conclusions to be admissible." *Marini v. Adamo*, 995 F. Supp. 2d 155, 180 (E.D.N.Y. 2014) (citing *Joiner*, 522 U.S. at 146). Thus, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266; *see Nimely*, 414 F.3d at 396 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." (alteration in original) (quoting *Joiner*, 522 U.S. at 146)).

The Second Circuit has cautioned, however, that courts "should only exclude [expert] evidence if the flaw [in the expert's reasoning or methodology] is large enough that the expert lacks 'good grounds' for his or her conclusions," *Amorgianos*, 303 F. 3d at 267 (internal citations omitted); in turn, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and

appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. "It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions," *United States v. Napout*, 963 F.3d 163, 187 (2d Cir. 2020), and "[f]requently...'gaps or inconsistencies in the reasoning leading to [the expert's] opinion...go to the weight of the evidence, not to its admissibility.'" *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) (quoting *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001)); *see also Davids v. Novartis Pharms. Corp.*, 857 F. Supp. 2d 267, 279 (E.D.N.Y. 2012) ("To the extent Novartis argues that Dr. Kraut did not adequately rule out additional factors or has provided contradictory testimony in the various depositions, these are credibility determinations that go to the weight and not the admissibility of his opinions.")

Finally, although the district court must ascertain the reliability of an expert's methodology, the gatekeeping function "does not necessarily require that a separate hearing be held in order to do so." *Williams*, 506 F.3d at 161.

### C.   Relevance

Courts must assess whether the expert testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see In re Fosamax Prods. Liab. Litig.*, 807 F. Supp. 2d 168, 179 (S.D.N.Y. 2011) (noting that

"[h]elpfulness can be expressed as a question of 'fit'—'whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute'" (quoting *Daubert*, 509 U.S. at 591)), *aff'd*, 707 F.3d 189 (2d Cir. 2013), and *aff'd*, 509 F. App'x 69 (2d Cir. 2013). The Court examines relevance under FRE 401 and weighs the balance of the probative value of challenged evidence and testimony with the risk of prejudice under FRE 403. *See Daubert*, 509 U.S. at 595.

## DISCUSSION

**I. Defendants' Motions to Preclude Certain Testimony of Plaintiff's Experts**

Defendants move to challenge certain portions of expert testimony from three of Plaintiff's anticipated experts. The Court addresses each in turn.

### A. Defendants' Motion to Preclude Certain Testimony of Dr. Stanislav Avshalumov, D.O.

First, Defendants move to preclude Plaintiff's expert witness, Dr. Stanislav Avshalumov, D.O., from testifying as to Plaintiff's need for future knee replacement surgery. (*See generally* ECF No. 49 ("Avshalumov Mot.").) They argue that Dr. Avshalumov's opinion is not the product of reliable principles and methods, and even if so, he fails to reliably apply them.

Defendants do not oppose Dr. Avshalumov's qualifications as an expert in knee surgery. (*See* ECF No. 51 ("Avshalumov Reply")

¶ 5.) Regardless, the Court "must satisfy itself" that Dr. Avshalumov is qualified under FRE 702. *Speedfit LLC v. Woodway USA, Inc.*, No. 13-cv-1276 (KAM) (AKT), 2019 WL 1435911, at *5 (E.D.N.Y. Mar. 29, 2019). Dr. Avshalumov is board-certified in orthopedic surgery, licensed in New York and New Jersey, did a post-graduate residency in orthopedic surgery at Peninsula Hospital Center in Far Rockaway, New York, and did a Fellowship in Joint Preservation, Resurfacing and Replacement at Washington University Orthopedics in St. Louis, Missouri. (Avshalumov Mot., Ex. B at 28-29;[1] Ex. C ("Avshalumov Dep.") at 10:17-21.[2]) Dr. Avshalumov has demonstrated sufficient "knowledge, skill, experience, training, or education" and is qualified to provide expert testimony, provided his testimony conforms to FRE 702's remaining requirements. Fed. R. Evid. 702.

Defendants principally argue that Dr. Avshalumov failed to show reliable principles and methods for his opinion on Plaintiff's need for a future total knee replacement, and that even assuming he did show such principles and methods, he did not reliably apply them. Plaintiff's core argument is that Defendants' objections affect the weight of Dr. Avshalumov's testimony, not its admissibility. (*See* ECF No. 50 ("Avshalumov Resp.")).

As a threshold matter, the testimony is relevant under FRE

---

[1] The Court refers to the ECF pages, as the exhibits are not individually paginated.
[2] The Court cites to the deposition pages of deposition testimony.

401 and would "help the trier of fact to understand the evidence or to determine a fact in issue," namely, whether Plaintiff may require a future right knee replacement, and the potential future damages. Fed. R. Evid. 702.

The Court further finds that Dr. Avshalumov bases his opinion on Plaintiff's probable need for a future knee replacement on sufficient facts and data, and that his testimony is the product of reliable principles and methods that are reliably applied. Dr. Avshalumov's opinion is a product of his observations during surgery, and review of Plaintiff's medical records, including x-ray and MRI imaging related to his right knee. (ECF No. 49, Ex. A ("Avshalumov Rep.") at 23-24.) Further, although Plaintiff designated him an expert witness, Dr. Avshalumov is also Plaintiff's treating physician, and Dr. Avshalumov also reviewed results from pre- and post-operative orthopedic exams that he conducted, along with a report of the right knee surgery itself: Plaintiff first saw Dr. Avshalumov for treatment of his left knee, and later returned for treatment of his right knee following the collision giving rise to this case, once on February 25, 2019, again on March 7, 2019, for an arthroscopy of his right knee, and again on March 18, 2019, for a post-operative visit. (*Id.* at 24.) Dr. Avshalumov again saw Plaintiff on August 16, 2021, for a physical examination requested by Plaintiff's attorney, to obtain a narrative report related to the instant case. (*Id.*)

Dr. Avshalumov's deposition testimony stated that after "[g]oing inside the knee and the chondral defect and deterioration of cartilage, there is probably more probability to have a knee replacement," and that "in [his] practice [he] see[s] patients after a knee scope with a chondral defect for knee replacement." (Avshalumov Dep. at 39:5-7, 21-23.) He further stated that he based his opinion regarding the probability of Plaintiff's total knee replacement on the fact that his "intraoperative demonstrate[d] [Plaintiff] started having problem [sic] with his cartilage," and he "[a]lready [had a] presence of cartilage delamination and process of devastation of the cartilage start[ing]," such that there was "[m]ore probability in the future he may require knee replacement." (*Id.* at 41:11-17.) He also stated that he took intraoperative photographs of the tears in the right knee, which he incorporated into his report. (*Id.* at 26:25-27:11.)

Courts in this Circuit "regularly admit expert testimony from doctors who apply their training and professional experience to a review of similar sources of information." *Tardif v. City of New York*, No. 13-cv-4056 (KMW), 2022 WL 2195332, at *7 (S.D.N.Y. June 17, 2022) (admitting medical expert testimony relying on expert's "knowledge, training and experience as a board certified neurologist," patient's history, neurological exam, diagnostic testing, and medical records), *reconsideration denied*, No. 13-cv-4056 (KMW), 2022 WL 2239793 (S.D.N.Y. June 22, 2022); *Monterey v.*

*City of New York*, No. 17–cv–4477 (VEC), 2019 WL 5884466, at *5 (S.D.N.Y. Nov. 12, 2019) (finding expert reliable when "bas[ing] her opinion on a review of Plaintiff's medical records, an analysis of his MRI results, and a review of his deposition transcript" because "[t]hose sources of information provided [expert] with 'good grounds' for her opinion and ensure that her opinion is 'adequately grounded in the methods and procedures of science' and based on 'more than subjective belief or unsupported speculation'" (quoting *Amorgianos*, 303 F.3d at 267)); *see also Bermudez v. City of New York*, No. 15–cv–3240 (KAM) (RLM), 2019 WL 136633, at *13 (E.D.N.Y. Jan. 8, 2019) (noting that "[e]valuation of the patient's medical records, like performance of a physical examination, is a reliable method of concluding that a patient is [injured]" (alternation in original) (quoting *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 483 (E.D.N.Y. 2011)).

Here, Dr. Avshalumov explains that his opinion on Plaintiff's probable need for a total knee replacement is based in part on his experience in practice with patients that, after a knee scope with a chondral defect and cartilage deterioration, require knee replacements. Dr. Avshalumov also states that the process of cartilage devastation had already started for Plaintiff specifically, based on his intraoperative report of the surgery. (Avshalumov Dep. at 41:11-17.) Accordingly, the Court finds Dr. Avshalumov's experience and review of Plaintiff's medical

records, including imaging of his knee, clinical examinations, and surgical findings, establish that his opinion as to Plaintiff's probable need for a future knee replacement is a product of reliable principles and methods that are reliably applied, and he sufficiently explains "how his opinion was based on his experience or medical education[.]" *Vale v. United States of Am.*, 673 F. App'x 114, 117 (2d Cir. 2016).

Defendants raise many objections to Dr. Avshalumov's opinion, including that he was unable to cite to studies or statistics, or state how often patients who have arthroscopies later require knee replacements; that he failed to reference peer reviewed medical studies on the likelihood of future total knee replacement following arthroscopy; that he failed to sufficiently account for age-related degeneration; that he failed to reconcile his testimony that although a main indicator of cartilage deterioration is ongoing patient complaints, Plaintiff had not raised complaints with him in the intervening two-and-a-half years between Plaintiff's post-operative appointment and his August 16, 2021 assessment in anticipation of litigation; and that Dr. Avshalumov had not ordered radiologic studies to assess the progression of Plaintiff's cartilage following the surgery.

Defendants also focus on inconsistencies in Dr. Avshalumov's conclusion. Dr. Avshalumov's report states that "[i]t is more probable than not that [Plaintiff] will require a total knee

replacement in the future." (Avshalumov Rep. at 25.) His deposition testimony, however, tends to characterize the likelihood of total knee replacement only as an increased probability—for example, stating that with "a cartilage defect and cartilage deteriorating, it is probably more possible for [a] patient to have a total knee replacement in the future," and as to Plaintiff specifically, noting there is "[m]ore probability in the future he may require knee replacement" given there is "[a]lready presence of cartilage delamination and process of devastation of the cartilage[.]" (Avshalumov Dep. at 40:10-13, 41:11-17.)

Defendants' objections are not sufficient to render unreliable and inadmissible Dr. Avshalumov's opinion on the probability of Plaintiff needing a future total knee replacement. District courts should only exclude expert evidence based on questionable reliability when "the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions," *Amorgianos,* 303 F.3d at 267 (noting that cross-examination is an appropriate tool by which to challenge "reliable, albeit debatable, expert testimony"), because "the traditional and appropriate means of attacking shaky but admissible evidence" is not exclusion but "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," *Daubert*, 509 U.S. at 596.

16

Despite Defendants' arguments, the Court does not find "too great an analytical gap between the data and the opinion proffered" to mandate exclusion where Dr. Avshalumov reviewed Plaintiff's medical records, right knee imaging, results from right knee surgery and corresponding exams, in conjunction with his experience that patients after an arthroscopic knee procedure with a chondral defect require knee replacement, to support his opinion on Plaintiff's probable need for future knee replacement. *Restivo*, 846 F.3d at 577 (quoting *Joiner*, 522 U.S. at 146). District courts are to "focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Bustamante, LLC*, 100 F. 4th at 427. Here, inconsistencies or gaps in Dr. Avshalumov's conclusion regarding the likelihood of total knee replacement affect the weight, and not admissibility, of his opinion. *See Restivo*, 846 F.3d at 577 (noting that "[f]requently...'gaps or inconsistencies in the reasoning leading to [the expert's] opinion...go to the weight of the evidence, not to its admissibility'").

The same is true of Dr. Avshalumov's failure to rely on peer reviewed medical studies, which goes to the weight and credibility of his testimony where he "otherwise reliably utilizes scientific methods to reach a conclusion[.]" *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 124 (2d Cir.

2020) (quoting *Amorgianos*, 303 F.3d at 267); *McCullock*, 61 F.3d at 1043-44 (noting "lack of textual authority" ultimately "go[es] to the weight, not the admissibility" of expert's medical testimony and admitting testimony where expert "could not point to a single piece of medical literature" supporting his conclusion, in view of his "background" and the "range of factors" supporting his opinion).

Accordingly, the Court denies Defendants' motion to preclude Dr. Avshalumov's testimony regarding Plaintiff's probable need for a future knee replacement.

**B.    Plaintiff's Motion to Preclude Certain Testimony of Dr. George DiGiacinto, M.D.**

Second, Defendants move to preclude Plaintiff's spine expert, Dr. George DiGiacinto, M.D., from testifying as to Plaintiff's likelihood of future surgery due to adjacent segment degeneration in the cervical and lumbar spine. (ECF No. 52 ("DiGiacinto Mot.") at 1, 9.)

Dr. DiGiacinto's expert report generally references "the likelihood of future surgery due to adjacent segment degeneration," without quantifying the likelihood. (DiGiacinto Mot., Ex. A ("DiGiacinto Rep.") at 9.) He also testified in his deposition, in response to a question regarding the incidence "of surgery for an adjacent segment degeneration after surgical diskectomy effusion," that he "[did not] know the exact number. 20

18

to 40 percent. It depends a little bit on pathology above or below the level of effusion." (DiGiacinto Mot. at 9; Ex. C ("DiGiacinto Dep.") at 46:19-47:5.) He testified to the same numbers for surgery for adjacent segment degeneration after lumbar fusion. (*Id.*)

Defendants explicitly do not challenge Dr. DiGiacinto's qualifications as a spinal surgeon. (*See* ECF No. 54, DiGiacinto Reply, ¶ 5.) The Court finds Dr. DiGiacinto is qualified to provide expert testimony about spinal surgery, provided his testimony conforms to FRE 702's remaining requirements. *See Speedfit LLC*, No. 13-cv-1276 (KAM) (AKT), 2019 WL 1435911, at *5. Dr. DiGiacinto is board-certified in neurological surgery and received his medical education from Harvard Medical School. (DiGiacinto Mot., Ex. B at 34-35; DiGiacinto Dep. 41:19-20.) At the time he retired from active practice in 2019, Dr. DiGiacinto was an Assistant Professor of Neurological Surgery at Mount Sinai West Hospital, capping a nearly a half-century of medical practice. (DiGiacinto Mot., Ex. B. at 34.)

Regarding reliability, Defendants principally argue that Dr. DiGiacinto failed to explain what methodology he used to reach his opinion regarding "the likelihood of future surgery due to adjacent segment degeneration" and fault him for not reviewing peer reviewed literature to support his opinion. Defendants further argue that even assuming Dr. DiGiacinto did offer reliable methods, he does not reliably apply them to the facts of this case because he did

not know there was an MRI of Plaintiff's cervical spine from 2017, and because he did not compare 2018 and 2019 MRIs with an October 18, 2015 CT scan. (DiGiacinto Mot. at 13.)

Plaintiff, in turn, argues that the lack of specified peer reviewed articles, and any other failure to review materials, goes to the weight, not admissibility, of his testimony. (*See* ECF No. 53 ("DiGiacinto Resp.") ¶¶ 11-12.)

The Court finds Dr. DiGiacinto's opinion on the likelihood of future surgery due to adjacent segment degeneration to be unreliable. Dr. DiGiacinto reviewed Plaintiff's medical history, medical records, and results from Dr. DiGiacinto's physical examination of Plaintiff. (*See generally* DiGiacinto Rep.) Then, as part of the report's conclusion, Dr. DiGiacinto references "the likelihood of future surgery due to adjacent segment degeneration." (*Id.* at 9.) He does not explain how his conclusion regarding the likelihood of future surgery due to adjacent segment degeneration is connected to the existing facts or data, and neither does his deposition testimony clarify a methodology. FRE 702, however, "requires that there be a sufficiently reliable connection between the methodology and the expert's conclusions for such conclusions to be admissible." *Marini*, 995 F. Supp. 2d at 180 (citing *Joiner*, 522 U.S. at 146). Further, when asked in his deposition generally about the "incidents of surgery for an adjacent segment degeneration after surgical diskectomy effusion,"

Dr. DiGiacinto stated, "I don't know the exact number. 20 to 40 percent. It depends a little on pathology above or below the level of effusion." (DiGiacinto Dep. 46:16-21.) He testified that the incidence of surgery for adjacent segment degeneration after lumbar fusion was "[a]bout the same frequency. Again, it depends on a certain degree of pathology above or below the level of previous fusion." (*Id.* at 46:25-47:5.) Regarding his opinion that "pathology above or below the level of" fusion impacts the incidence of surgery, Dr. DiGiacinto stated that "you would have to worry a little more [regarding surgery] if there is already significant degeneration above or below the treated segment that might give out in the future." (*Id.* at 47:9-14.)

However, Dr. DiGiacinto does not appear to offer any principle or method on which he bases the range of 20 to 40 percent incidence of adjacent segment surgery for either the neck or back. Dr. DiGiacinto testified that he did not review, nor could he cite, any peer reviewed literature to determine either opinion. (*Id.* at 46:22-47:17.) Further, although Dr. DiGiacinto may be basing his opinion on his experience, he fails to explain how such experience formed his opinion. This is insufficient under *Daubert* and FRE 702. *See Vale*, 673 F. App'x at 117 (noting expert "lacked reliable foundation because he provided no explanation as to how his opinion was based on his experience or medical education"); *Potter v. United States*, No. 17-cv-4141 (AJN), 2020 WL 2836440, at *7

(S.D.N.Y. May 30, 2020) ("While Plaintiff argues that Dr. Rosenbaum's opinion is based on his 'clinical experience,'...'an expert relying solely on his experience "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."'" (internal citations omitted)).

Further, even assuming his opinion on the likelihood of adjacent segment surgery was a product of a reliable principle or method, Dr. DiGiacinto did not reliably apply it. When asked directly whether he had an opinion whether Plaintiff specifically "will require adjacent segment fusion surgery on either his neck or back in the future," he answered: "Only from a statistical point of view rather than any specific observation" and confirmed the "statistical point of view" referenced the previously stated 20 to 40 percent incidence rate. (DiGiacinto Dep. 55:15-22.) By explicitly basing his conclusion "[o]nly" on "a statistical point of view" and not on "any specific observation" of Plaintiff, and not on any study or medical source, Dr. DiGiacinto does not appear to have applied any principle or method at all "to the facts of the case." Fed. R. Evid. 702. This is problematic because Dr. DiGiacinto also testified that the range of 20 to 40 percent "depends a little bit on pathology above or below" the level of fusion, which requires, even in his own words, some sort of "specific observation" of Plaintiff's own pathology. "A court may

conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Nimely*, 414 F.3d at 396 (quoting *Joiner*, 522 U.S. at 146)); *see In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 433–34 (S.D.N.Y. 2016) ("When asked to explain where he got some of the figures he used in that calculation, Dr. Young cited 'just kind of my experience working with pregnant and nonpregnant tissue and just in terms of contractility of uterine tissue,'...and said that he derived these calculations from his 'experience and talking with the people who have done the research, [who] seem to be getting those values,'....This does not rise to the level of intellectual rigor of medical or scientific study, rendering this opinion unreliable." (citing *Joiner,* 522 U.S. at 146) (footnote omitted)).

Defendants also argue that Dr. DiGiacinto failed to reliably apply principles and methods because he was not aware of an MRI of Plaintiff's cervical spine from 2017, and because he did not compare the 2018 and 2019 MRIs with the October 18, 2015 CT scan. Defendants do not specifically tie Dr. DiGiacinto's failure to review and compare such scans with the argument that his opinion on the likelihood of adjacent segment surgery is unreliable. Regardless, that he explicitly stated that his opinion of the 20 to 40 percent incidence rate is based "[o]nly [on] a statistical point of view rather than any specific observation" leads this Court to believe that Dr. DiGiacinto did not rely on Plaintiff's

specific imaging for his conclusion regarding the likelihood of adjacent segment surgery.

Plaintiff argues that Dr. DiGiacinto is permitted and qualified to provide an opinion, even without textual evidence, and that Defendants' attacks are properly characterized as addressing the weight, not admissibility, of testimony. (*See generally* DiGiacinto Resp.) Plaintiff ignores the remaining FRE 702 requirements that an expert, however qualified, must ensure their testimony is a "product of reliable principles and methods" that are reliably applied "to the facts of the case." *See* Fed. R. Ev. 702. Here, Dr. DiGiacinto has not reliably used principles and methods to reach his conclusion regarding the likelihood of surgery due to adjacent segment degeneration. Although "[t]rained experts commonly extrapolate from existing data...nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner,* 522 U.S. at 146; *see Balura v. Ethicon, Inc.*, No. 19-cv-1372 (LEK) (ML), 2020 WL 819293, at *10 (N.D.N.Y. Feb. 19, 2020) ("[W]hile it seems perfectly plausible to the Court that Mrs. Balura will continue to suffer from dyspareunia and incontinence and, and [sic] that her incontinence could even worsen as Dr. Margolis predicts, without more information about Dr. Margolis' reasons for and methods in arriving at this conclusion, the Court cannot admit it under

24

*Daubert*.")

Because the Court finds that Dr. DiGiacinto's opinion on the likelihood of surgery for adjacent segment degeneration is unreliable, the Court need not consider whether such testimony would be helpful to the trier of fact. *See Bermudez v. City of New York*, No. 15-cv-3240 (KAM) (RLM), 2018 WL 6727537, at *7 (E.D.N.Y. Dec. 21, 2018) (making no finding as to relevance when concluding that expert may not offer opinion).

Finally, Plaintiff briefly requests in his opposition that "should this Court feel that Defendants' concerns and arguments are legitimate, which Plaintiff in no way concedes herein, then it is respectfully submitted that this motion should still be denied as premature, as Dr. DiGiancinto [sic] will submit the foundation(s) for his opinion(s) as necessary at the time of trial." (DiGiacinto Resp. ¶ 17.) The Court respectfully disagrees that Defendants' motion is premature. Discovery in this case closed on August 1, 2022. (*See* June 1, 2022 Order; August 25, 2022 Order.) Plaintiff's expert had an obligation under Federal Rule of Civil Procedure 26(a)(2) to provide a written report containing not only his opinions, but also the bases and reasons for them, including the facts or data he considered in forming the opinion. Although Rule 26(a)(2) "'contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report,'" *In re Payment Card Interchange Fee and Merch.*

*Disc. Antitrust Litig.*, 638 F. Supp. 3d at 301, as noted, Dr. DiGiacinto's deposition testimony failed to articulate a reliable principle or method that he reliably applied to the facts of this case regarding the likelihood of future surgery on Plaintiff's neck and back due to adjacent segment degeneration. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Nimely*, 414 F.3d at 396 (alteration in original) (quoting *Joiner*, 522 U.S. at 146).

Accordingly, Defendants' motion is not premature and is granted.

### C.    Plaintiff's Motion to Preclude Certain Testimony of Dr. Barry C. Root, M.D.

Third, Defendants move to preclude Plaintiff's expert, Dr. Barry Root, M.D., from testifying as to Plaintiff's need for future surgery and medical treatment as projected in his "Life Care Plan." Defendants argue Dr. Root failed to provide a sufficient foundation and explanation of methodology used for his conclusions concerning the likelihood of needing future surgery and medical treatment, and that even assuming Dr. Root's methods are reliable, his application of his methods is not. (ECF No. 55 ("Root Mot.") at 7.)

Plaintiff argues Dr. Root's medical experience, along with his review of Plaintiff's medical records, two teleconferences

26

with Plaintiff prior to the first report, and a physical examination of Plaintiff prior to his supplemental report, constitute reliable grounds to support his opinion on the need for future surgery and medical treatment. Plaintiff also argues that Defendants' objections go to the weight, not admissibility, of Dr. Root's testimony. (*See generally* ECF No. 56.)

Though Defendants do not explicitly challenge Dr. Root's qualifications, (*see generally* Root Mot.), Defendants raise certain points that nonetheless appear to assert such a challenge. For example, Defendants note Dr. Root is not a certified life care planner, that he did not take classes to learn how to prepare life care plans, and that he learned to prepare life care plans "by largely making it up." (*Id.* at 10.)

Notwithstanding Defendants' arguments, the Court finds Dr. Root is qualified to provide expert testimony, provided that it conforms to FRE 702's remaining requirements. First, after being confronted in his deposition with his alleged prior statement from another case that he prepares life care plans "largely by making [them] up," Dr. Root testified that he did not "recall saying that" and "believe[s] it's taken out of context," (ECF No. 55-3 ("Root Dep.") at 35:18-24), and Defendants offer nothing to the contrary.

Second, although Dr. Root testified that he had not taken classes to learn to prepare life care plans, and that he is not a certified life care planner, (*id.* at 35:25-36:5, 40:7-12),

Defendants cite no case law to suggest that a witness who has not taken prior classes and lacks certification is necessarily unqualified to testify to life care plans. Other courts in this Circuit have denied motions to preclude expert testimony regarding life care plans where the expert was not a certified life care planner. *See Corneli v. Adventure Racing Co., LLC*, No. 12-cv-1303 (FJS) (TWD), 2015 WL 4716285, at *11-12 (N.D.N.Y. Aug. 7, 2015) (denying motion to preclude expert testimony where defendant offered no authority for argument that expert must be certified, and where expert was not a certified life care planner, medical doctor, or vocational expert but had 30 years' experience of occupational evaluation and assessment of handicapped individuals' needs, reviewed medical records, performed an in-person assessment, and was familiar with costs and services).

Further, "[e]ven if a proposed expert lacks formal training in a given area, he may still have 'practical experience' or 'specialized knowledge' qualifying him to give opinion testimony under Rule 702." *Lickteig*, 589 F. Supp. 3d at 328 (citing *McCullock*, 61 F.3d at 1043); *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004) ("The Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience.")

28

Dr. Root is board-certified in physical medicine and rehabilitation, and he had an additional subspeciality board certification in spinal cord injury medicine from 2003 to 2013. (ECF No. 55-1, Ex. B at 32.) He is currently an Assistant Clinical Professor of Physical Medicine & Rehabilitation at Hofstra Northwell School of Medicine; was an adjunct Clinical Assistant Professor of Rehabilitation Medicine at New York Hospital/Cornell University Medical Center for nearly two decades; and was Chairman of the Department of Physical Medicine and Rehabilitation at Glen Clove Hospital for nearly two decades. (*Id.* at 33-34.) He is currently transitioning to retirement and decreasing his clinical work seeing patients. (Root Dep. at 22:6-12.) Dr. Root has offered consulting services "related to neuro-musculoskeletal medicine, long-term management of chronic pain and care of disabled individuals" since 2005. (ECF No. 55-1, Ex. B. at 33.)

Next, as a threshold matter, the Court finds that Dr. Root's opinions as to Plaintiff's future surgery and medical needs are relevant under FRE 401 and would assist a trier of fact to determine Plaintiff's future medical expenses. Fed. R. Evid. 702.

The Court further finds that Dr. Root's opinions on Plaintiff's future surgery and medical needs are based on sufficient facts and are the product of reliable principles and methods, which he has reliably applied. Specifically, Dr. Root stated in his deposition testimony that his opinions on the need

for future knee, neck, and back surgery are generally a product of his medical education and experience, reviewing Plaintiff's medical records, including reports from his treating doctors, and, as to the need for knee surgery, his familiarity with the research and Plaintiff's age. (Root Dep. 69:14-73:8.) Dr. Root also twice interviewed Plaintiff via teleconference, due to the COVID-19 pandemic, prior to preparing his first report; he later physically examined Plaintiff and prepared a supplementary report. (ECF No. 55-2, Root Supplemental Report at 1.)

Courts in this Circuit have found that expert testimony regarding life care plans relying on similar principles and methods satisfy *Daubert* and FRE 702. *See, e.g.*, *Qureshi v. Costco Wholesale Corp.*, No. 20-cv-4086 (PK), 2022 WL 16757952, at *2 (E.D.N.Y. Nov. 8, 2022) (noting "courts in this circuit have admitted the expert testimony of lifecare planners whose findings are based on those of treating medical providers" and collecting cases); *Csikos v. S.M. Constr. & Contracting, Inc.*, No. 18-cv-9598 (VEC), 2022 WL 3211462, at *9 (S.D.N.Y. Aug. 9, 2022) (denying motion to preclude medical expert's testimony on future medical costs where expert "personally examined Plaintiff and reviewed his prior medical records," finding him thus "well situated to opine on Plaintiff's need for treatment as he ages"); *Kiss v. Clinton Green N., LLC*, No. 17-cv-10029 (LGS), 2021 WL 4272741, at *2 (S.D.N.Y. Sept. 21, 2021) (denying motion to preclude expert testimony on life care

plan where expert's opinions were "based on his background and experience" as "a medical doctor, board certified in physical medicine and rehabilitation" and as "a certified independent medical examiner," and where expert "reviewed Plaintiff's medical records and conducted a physical examination" and accordingly "opined about Plaintiff's future medical needs, including medical care, medications, diagnostic studies, therapies and assisting devices"); *Frometa v. Diaz-Diaz*, No. 07-cv-6372 (HB), 2008 WL 4192501, at *3 (S.D.N.Y. Sept. 11, 2008) ("In light of Dr. Kincaid's experience and the evident research that he conducted and that is reflected in his life care plan, including extensive quotes from Plaintiff's medical records, the *Daubert* criteria have been met.")

Defendants argue Dr. Root's opinions regarding future surgery and medical needs are speculative, not based on facts of the case, and lack the required indicia of reliability. (*See generally* Root Mot.; ECF No. 57, Root Reply ¶ 5.) For example, Defendants cite Dr. Root's failure to: (1) physically evaluate Plaintiff prior to preparing his initial Life Care Plan, and the fact that his supplemental report and Life Care Plan following an eventual physical examination were nearly identical to the first; (2) speak to Plaintiff's treating physicians; (3) rely on peer-reviewed articles; and (4) know the incidence rate of future surgeries following Plaintiff's injuries. Defendants also take issue with

Dr. Root's projection of certain treatments that Plaintiff's treating physicians had not recommended, and that Dr. Root's deposition testimony stated he did not review Plaintiff's medical records from 2021 up to early 2022, when he was deposed.[3]

Defendants, however, fail to convince the Court that Dr. Root's opinions are "speculative or conjectural," *In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d at 242, or otherwise "based on insufficient facts or data," *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d at 284. For example, although Dr. Root did prepare his initial report based on two teleconference calls with Plaintiff, he later physically examined Plaintiff and supplemented his report. He further stated in his deposition testimony that limited availability of medical services during the pandemic contributed to such gaps. (Root Dep. at 80:9-12.) Defendants will be able to explore the purported weaknesses in Dr. Root's opinions through cross-examination. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Restivo*, 846 F.3d at 577 (noting that "gaps or inconsistencies in the reasoning" of

---

[3] Defendants' motion states that "Dr. Root did not know what doctors, if any, Mr. Geurrero [sic] had seen in 2020, 2021 or 2022." (Root Mot. at 11.) However, Dr. Root's supplemental report expressly considers Plaintiff's visits and procedures by treating physicians in January and March 2020. (ECF No. 55-2 at 6.)

experts "go to the weight of the evidence, not to its admissibility" (internal citations omitted)).

Further, that Dr. Root did not speak to Plaintiff's treating physicians goes to the weight, not admissibility, of his testimony. *See Reichmann v. Whirlpool Corp.*, No. CV 16-5151 (AYS), 2021 WL 12102128, at *3 (E.D.N.Y. Mar. 9, 2021) (noting that standard for life care planners does not require direct consultation with treating physicians, and arguments that expert failed to directly consult with plaintiff's treating physicians when forming recommendations "are not the kind of deep-seated methodological flaws that can preclude an expert's testimony"); *Tardif*, No. 13-cv-4056 (KMW), 2022 WL 2195332, at *11 (finding degree of treating physicians' involvement in creation of life care plan goes to weight of evidence, not admissibility); *see also Qureshi*, No. 20-cv-4086 (PK), 2022 WL 16757952, at *2 (admitting expert testimony of life care planner, notwithstanding that expert "never spoke to Plaintiff's doctors and did not conduct an in-person evaluation of Plaintiff").

Dr. Root's failure to rely on peer reviewed studies similarly goes to the weight of his testimony where, as here, he "otherwise reliably utilizes scientific methods to reach a conclusion[.]" *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d at 124; *McCullock*, 61 F.3d at 1043-44 (noting "lack of textual authority" ultimately "go[es] to the weight, not the

33

admissibility" of expert's medical testimony and admitting testimony where expert "could not point to a single piece of medical literature" supporting his conclusion, in view of his "background" and "range of factors" on which he based his opinion).

Defendants also take issue with Dr. Root's projection of certain medical care that Plaintiff's current treating physicians have not recommended. (Root Mot. at 13.) The fact that treating physicians have not recommended certain care does not necessarily "preclude Plaintiff's need for [such care] in the future." *Bauta v. Greyhound Lines, Inc.*, No. 14-cv-3725 (RER), 2019 WL 8060183, at *4 (E.D.N.Y. Jan. 4, 2019) (finding plaintiff not taking Percocet at time of trial did not preclude "need for it in the future" when assessing future cost of care); *id.* (rejecting defendants' argument that because plaintiff "never received home care prior to trial" and did "not appear to need it currently" that "the evidence [did] not support awarding any home care as part of Plaintiff's future costs" and finding jury award not contrary to evidence or lacking foundation); *Csikos*, No. 18-cv-9598 (VEC), 2022 WL 3211462, at *9 (in context of life care plan, noting "costs of future assistive devices and prescription medications that Plaintiff may require—irrespective of whether Plaintiff currently requires such care—are not so speculative that a physician cannot opine on the likelihood Plaintiff will need such treatment in the future" and noting a jury could reasonably

find plaintiff will likely require certain treatment "in the future, despite not needing such care currently"). Instead, Defendants "can and should press" Dr. Root "on these claims during cross-examination[.]" *Csikos*, No. 18-cv-9598 (VEC), 2022 WL 3211462, at *9; *see Daubert*, 509 U.S. at 596.

Accordingly, because the Court finds no reason to preclude Dr. Root from testifying regarding Plaintiff's anticipated need for future surgery and medical treatment, Defendants' motion is denied. Nonetheless, Plaintiff shall avoid presenting cumulative evidence, especially regarding Plaintiff's probable need for knee replacement surgery.

## II. Defendants' Motion to Preclude Reference to Specific Numerical Figures for Damages

Fourth, Defendants move to preclude Plaintiff's counsel from referencing specific numerical figures for damages. Defendants argue that permitting Plaintiff's counsel to request a specific dollar amount in damages would improperly sway or "anchor" the jury with suggestions of damages that are potentially insufficiently supported by evidence. (*See generally* ECF No. 58.) Plaintiff argues that Defendants improperly seek an advisory ruling; alternatively, Plaintiff requests that this Court follow *Joseph v. Deluna*, No. 15-cv-5602 (KMW), 2018 WL 5095668, at *3 (S.D.N.Y. Oct. 19, 2018), where the court precluded suggestions of a specific damage award in plaintiff's opening statement but

reserved the decision on whether it would permit such a suggestion during summation.

As a threshold matter, Plaintiff appears to argue that the issue presented by the instant motion, requesting a specific numerical figure for damages, is one "that [has] not been but may potentially be in controversy in the future," and therefore a decision by this Court would be an impermissible advisory opinion. (ECF No. 59 ¶ 5.) Plaintiff's argument is without merit. An opinion is improperly advisory where, for example, the court is not "resolv[ing] real issues between genuine adversaries" and is merely opining on "abstract or theoretical questions." *Abele v. Markle*, 452 F.2d 1121, 1124 (2d Cir. 1971). Although a court may find a motion in limine unripe in certain situations, *see Abbott v. United States*, No. 96-cv-0510, 1998 WL 743711, at *2 (N.D.N.Y. Oct. 21, 1998) (reserving decision on government's motions in limine made in advance of government electing to move for summary judgment), this is not one of them. The issue regarding a specific damages request is hardly "abstract or theoretical," because the parties in this case will commence trial imminently. *Abele*, 452 F.2d at 1124.

Turning to the propriety of specifying damage figures, "[t]he Second Circuit has advised that 'specifying target amounts for the jury to award is disfavored.'" *Equal Emp. Opportunity Comm'n v. United Health Programs of Am., Inc.*, No. 14-cv-3673 (KAM) (JO),

2017 WL 10088567, at *13 (E.D.N.Y. Sept. 4, 2017) (quoting *Consorti v. Armstrong World Indus.*, 72 F.3d 1003, 1016 (2d Cir. 1995) ("Such suggestions anchor the juror's expectations of a fair award at a place set by counsel, rather than by the evidence."), *vacated on other grounds*, 518 U.S. 1031 (1996)). The Circuit has left the question to "the discretion of the trial judge, who may either prohibit counsel from mentioning specific figures or impose reasonable limitations, including cautionary jury instructions." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 912 (2d Cir. 1997).

The Court grants in part and denies in part Defendants' motion. The Court follows the approach of many others in this Circuit and prohibits Plaintiff from suggesting or arguing to the jury a request for a specific dollar amount, but Plaintiff is permitted to argue to the jury with respect to a specific dollar amount for any compensable damages if supported by admissible evidence presented during his case-in-chief, and Defendants had an opportunity to cross-examine the witness presenting the evidence. *See, e.g.*, *Woolfolk v. Baldofsky*, No. 19-cv-3815 (WFK) (ST), 2022 WL 2600132, at *4 (E.D.N.Y. July 8, 2022) (prohibiting plaintiff from submitting to the jury a request for a specific dollar amount regarding non-economic damages but permitting plaintiff to argue to jury regarding specific dollar amount for compensable damages, such as previously incurred or foreseeable medical expenses, if supported by admissible evidence); *Ashley v. Civil*, No. 14-cv-5559

(NGG) (SMG), 2019 WL 1441124, at *11 (E.D.N.Y. Apr. 1, 2019) (precluding plaintiff from suggesting or submitting to jury specific dollar amount regarding non-economic damages but permitting plaintiff to argue during summation a specific dollar amount regarding other compensable damages, so long as figure had "reasonable basis in admissible evidence introduced during Plaintiff's case in chief and Defendant ha[d] an opportunity to respond if it cho[se] to do so"); *Jean-Laurent*, 840 F. Supp. 2d at 558 (precluding plaintiff's counsel from submitting specific dollar amount regarding damages for pain and suffering but permitting submission of dollar amount regarding other compensable damages if supported with admissible evidence during case in chief).

## Conclusion

For the reasons above, Defendants' motion to preclude Dr. Avshalumov from testifying regarding Plaintiff's probable need for a future knee replacement surgery is DENIED; Defendants' motion to preclude Dr. DiGiacinto from testifying regarding the likelihood that Plaintiff will need future spinal surgery due to adjacent segment degeneration in the cervical and lumbar spine is GRANTED; Defendants' motion to preclude Dr. Root from testifying to Plaintiff's potential needs for future surgery and medical treatment as projected in his "Life Care Plan" is DENIED; and Defendants' motion to preclude Plaintiff's counsel from

referencing specific numerical figures for damages is GRANTED IN

PART and DENIED IN PART.

**SO ORDERED.**

Dated:     November 13, 2024
           Brooklyn, New York

_____
KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York